IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| ROBERTO M. VILLARREAL, | § | |
|---|---|---|
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | EP-15-CV-88-KC |
| | § | |
| FIRST PRESIDIO BANK, AND ITS SUCCESSOR-IN-INTEREST, BIG BEND BANKS NATIONAL ASSOCIATION, D/B/A THE MARFA NATIONAL BANK, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION**

This is a civil action in which Plaintiff Roberto M. Villarreal alleges that Defendant First Presidio Bank and its Successor-in-Interest, Big Bend Banks, National Association, d/b/a The Marfa National Bank ("Defendant" or "the Bank") unlawfully refused to redeem five certificates of deposit that the Bank issued to Plaintiff in the 1980s. The Bank maintains that Plaintiff redeemed the certificates of deposit long ago. This Court conducted a bench trial of this matter on June 12 and 13, 2017. Plaintiff's only remaining cause of action against the Bank is his unjust-enrichment claim.[1]

Having heard the evidence and considered the arguments of counsel, the Court adopts the following findings of fact and conclusions of law.[2]

---

[1] *See* Pl.'s Second Am. Compl. ¶¶ 22-28, ECF No. 60; Order of July 14, 2017, ECF No. 94 (granting in part and denying in part Defendants' Motion for Judgment Pursuant to Federal Rule of Civil Procedure 52).

[2] The Court enters these findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52. Any below-listed conclusion of law which should more properly be listed as a finding of fact is hereby incorporated by reference and

**I.      FINDINGS OF FACT**

   **A.      Facts relevant to jurisdiction**

1.)   Plaintiff is a Mexican national who resides in Chihuahua, Mexico.

2.)   First Presidio Bank opened for business in 1975 in Presidio, Texas.[3]

3.)   Plaintiff seeks $210,572.50 in damages.

   **B.      The certificates of deposit**

4.)   On April 12, 1983, the Bank issued CD No. 281, a six-month CD in the amount of $10,000, to Plaintiff and Irene Amparan de Villarreal.[4]

5.)   On October 20, 1983, the Bank issued CD No. 256, a six-month CD in the amount of $15,000, to Plaintiff and Irene Amparan de Villarreal

6.)   On November 4, 1983, the Bank issued CD. No. A267, a six-month in the amount of $10,000, to Plaintiff and Irene Amparan de Villarreal.

7.)   On December 5, 1983, the Bank issued CD. No. A279, a six-month CD in the amount of $10,000, to Plaintiff and Irene Amparan de Villarreal

8.)   On June 22, 1984, the Bank issued CD. No. 419, a six-month CD in the amount of $12,000, to Plaintiff and Irene Amparan de Villarreal.

9.)   Each of the aforementioned original certificates of deposit remain in Plaintiff's possession.

10.)  The certificates of deposit were admitted into evidence at trial.[5]

---

adopted as a finding of fact.  Likewise, any below-listed finding of fact which should more properly be listed as a conclusion of law is hereby incorporated by reference and adopted as a conclusion of law.

[3] Big Bend Banks, N.A., merged with First Presidio Bank on or about January of 2008.

[4] At the time, Plaintiff was married to Irene Amparan de Villarreal.  In April of 2000, Irene Amparan de Villarreal died.  Plaintiff married Amida Anna Loya Galindo in 2004 and remains married to her.

[5] *See* Pl.'s Trial Exhibits 1-5.

11.) It is undisputed that the Bank issued these certificates of deposit to Plaintiff and Irene Amparan de Villarreal and that the certificates of deposit contain the language described below on their face.

12.) The four certificates of deposit issued to Plaintiff and Irene Amparan de Villarreal in 1983 contain the following language: "Payable to the depositor upon presentation of this certificate, properly endorsed, on a maturity date."

13.) The remaining certificate of deposit issued to Plaintiff and Irene Amparan de Villarreal in 1984 contains the following language: "We will pay this certificate to you when you present and deliver it to us, properly endorsed (signed by you), on a maturity date."

14.) The certificates of deposit provide for automatic renewal upon maturity at the prevailing market interest rate.

15.) The interest earned on a particular certificate of deposit was transferred to Plaintiff's checking account on the maturity dates of the certificates of deposit.

16.) The certificates of deposit contain language restricting their transferability and assignability.

17.) Either Plaintiff or Irene Amparan de Villarreal could have redeemed the certificates of deposit without the signature of the other by producing the original, physical certificate of deposit.

18.) Either Plaintiff or Irene Amparan de Villarreal could have redeemed the certificates of deposit without the original, physical certificate of deposit by signing a lost-certificate-of-deposit affidavit at the Bank.

19.) Lost-certificate affidavits had to be signed, dated, and notarized before the Bank would allow the affiant to redeem the certificate of deposit without producing the original certificate.[6]

   C.   **Plaintiff's relationship with the Bank**

---

[6] *See* Defs.' Trial Exhibit 24.

20.) Plaintiff placed the physical certificates of deposit in a safe deposit box that he rented at First Presidio Bank.[7]

21.) Plaintiff held a checking account with the Bank in addition to his certificate-of-deposit accounts.

22.) Plaintiff held a substantial number of additional certificates of deposit with the Bank beyond the five at issue in this litigation.

23.) Ramona Madrid, a Bank employee, executed wire transfers for Plaintiff when he would call by telephone or appear at the Bank.

24.) Plaintiff's checking account with the Bank was closed in 2008 with a negative balance.

25.) Plaintiff did not visit the Bank from 2002 to 2010.

26.) In May of 2014, Plaintiff visited the Bank and paid back rent and a locksmith's fee to regain access to his safe deposit box.

27.) On the same day, Plaintiff retrieved the physical certificates of deposit from the safe deposit box and requested that the Bank redeem them.

28.) The Bank concluded that Plaintiff had redeemed the certificates of deposit long ago and refused to redeem them.

29.) On March 24, 2015, Plaintiff filed the instant lawsuit.

### D. Bank records

30.) The summary statements for Plaintiff's checking account for the period between February 29, 2008 and August 29, 2008, reflect a small positive balance at the start of that period and a small negative balance at the end of that period.

31.) The safe deposit box lease agreement from October 3, 1990 indicates that Plaintiff was to pay rent of $30.00 annually for the use of the box.

32.) The rent ledger for the safe deposit box reflects an annual rental rate of $30.00.

---

[7] Exactly when Plaintiff rented his safe deposit box is the subject of some dispute. However, the exact date on which the rental took place is not material to resolving this litigation, so the Court examines it no further here.

33.) The Bank charged Plaintiff $30.00 for rent in 1991 and approximately $45.00 in rent for the years from 1992 to 2006.

34.) Handwritten notes scrawled in the upper-right corner of the rent ledger for the safe deposit box indicate that the Bank assessed $360.00 in back rent for the six-year period from 2008 to 2014 as well as additional fees when Plaintiff appeared in May of 2014 to open his safe deposit box.

35.) There is no record of the Bank charging rent for Plaintiff's safe deposit box for the year 2007.

### E. Record retention

36.) The Bank has no records concerning the certificates of deposit in question other than two microfilm rolls of quarterly records from the mid-1980s.

37.) There are no lost-certificate-of-deposit affidavits sworn either by Plaintiff or Irene Amparan de Villarreal pertaining to the certificates of deposit at issue in this litigation.

38.) The Bank currently complies with all regulatory and legal requirements with respect to record retention and follows record-retention practices that are standard for community banks.

39.) The Bank maintains records of open accounts.

### F. Absence of a record of escheat of Plaintiff's property to the state of Texas

40.) A search of Texas's unclaimed funds database reveals no results for Plaintiff.[8]
41.) The Bank did not escheat the contents of Plaintiff's safe deposit box to the state comptroller despite at least an eight-year period where the Bank lost contact with Plaintiff.[9]

### G. Additional certificate-of-deposit accounts redeemed through the lost-certificate affidavit process

---

[8] After three years without contact with the owner of a certificate of deposit that has reached maturity, the Bank would have been legally required to deem Plaintiff's certificates of deposit "abandoned" and escheat to the Texas Comptroller the balance held in the accounts. See Tex. Prop. Code Ann. §§ 73.101; 74.301.

[9] Texas law mandates that, after five years without contact with the owner of a safe deposit box, a bank must deem a safe deposit box "abandoned" and escheat its contents to the state. See Tex. Prop. Code Ann. §§ 74.101; 74.301.

42.) Ninfa Rodriguez, a Bank employee, testified that Plaintiff redeemed certificates of deposit by swearing out a lost-certificate affidavit on multiple occasions.

### H. Veracity of bank records

43.) The Bank's records are currently audited annually by an outside accounting firm, the Federal Deposit Insurance Corporation, and the Texas Department of Banking.

44.) The Bank also performs a "daily check" of all transactions to ensure that accounts are in balance.

### I. Damages

45.) Plaintiff damages are in the amount of the sum of the beginning balance of the certificates of deposit, $57,000, interest for each of the CDs from the date of purchase through 2015, $71,955.50, and the interest that would have been earned on the money market account from "the date of inception" through 2015, $81,617—a total of $210,572.50.[10]

46.) Defendant expressly declined to object to Plaintiff's damages calculation at trial.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

1.) The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

### B. Legal Standard

2.) To prevail in an unjust-enrichment action,[11] a plaintiff need only prove that the defendant holds money and that the money in equity and good conscience belongs to the plaintiff.[12]

---

[10] *See* Pl.'s Trial Exhibit 16.
[11] Defendants characterized Plaintiff's unjust-enrichment claim as a money-had-and-received claim both at trial and in their Motion for Judgment Pursuant to Federal Rule of Civil Procedure 52(c). *See generally* Defs.' Mot. for J. Pursuant to Rule 52(c), ECF No. 86. Out of an abundance of caution here, the Court notes that a number of Texas courts have held that plaintiffs cannot state a claim for unjust enrichment as an independent cause of action under Texas law. *See*, *e.g.*, *Casstevens v. Smith*, 269 S.W.3d 222, 229 (Tex. App. 2008). However, the Texas Supreme Court has held to the contrary. *See Fortune Prod. Co. v. Conoco, Inc*., 52 S.W.3d 671, 682-86 (Tex. 2000)

3.) The Fifth Circuit has described the principles governing claims for unjust-enrichment in Texas as follows:

> The question . . . is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him. Again, it has been declared that [this cause of action] is less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely at the inquiry, whether the defendant holds money, which belongs to the plaintiff.[13]

4.) In a civil action for damages, "Plaintiff's burden of proof is a mere preponderance of the evidence."[14]

## C. Application of Facts to Law

5.) The Court acknowledges that the Bank is at pains to emphasize that its record-retention practices are consistent with those for community banks in Texas and compliant with all relevant laws and regulations. However, though the Bank's destruction of records appears to have been entirely *permissible* under the law, the Court is unable to identify any valid legal principle that goes so far as to *insulate the Bank from liability* in suits where long-

---

(upholding summary judgment on some of plaintiff's unjust-enrichment claims). Texas courts have read claims for "unjust enrichment" as pleading an equitable common-law claim for money had and received. *See, e.g., London v. London*, 192 S.W.3d 6, 12-14 (Tex. App. 2005). Claims for money had and received and unjust enrichment are materially and substantively identical. *See id.* ("[A claim for money had and received] is not premised on wrongdoing, but looks to the justice of the case and inquires whether the party has received money that rightfully belongs to another.") (citation omitted); *see also Staats v. Miller*, 243 S.W.2d 686, 687-88 (1951) ("The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong. All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him."); *see also Compass Bank v. Villarreal*, No. CIV.A. L-10-8, 2011 WL 3515913, at *4 (S.D. Tex. Aug. 10, 2011) (internal citations omitted) ("When one party has been unjustly enriched by receiving money that in equity and good conscience belongs to another, the latter may bring an unjust enrichment claim for 'money had and received.'"). Accordingly, the Court treats Plaintiff's unjust-enrichment claim just as it would a common-law claim for money had and received.

[12] *See Norhill Energy LLC*, 2017 WL 1356321, at *6 (citing *Plains Exp. & Prod. Co. v. Torch Energy Advisors, Inc.*, 473 S.W.3d, 296, 302 n.4 (Tex. 2015)).

[13] *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004) (internal citations omitted).

[14] *Addington v. Tex*, 441 U.S. 418, 423 (1979).

7

destroyed records could potentially comprise an important element of the Bank's defense.[15]

6.) The fact that the Bank is subject to annual audits and a daily "check" to ensure that the ledger balances, and the fact that Plaintiff's checking account was closed in 2014, are insufficient to establish that Plaintiff's certificates of deposit were redeemed prior to 2014. It is unclear that Plaintiff's checking account would have been closed as a result of fees depleting the funds in the account, or conversely, that the account would have remained open had it been replenished with interest earnings from Plaintiff's certificate-of-deposit accounts as they automatically renewed. Any number of other possibilities—for example, additional withdrawals or deposits—are readily conceivable.

7.) The Court does not credit the assertion that the non-existence of records reflecting an escheat of Plaintiff's certificates of deposit to the state of Texas establishes that Plaintiff's certificates of deposit were redeemed long ago absent any evidence that the Bank undertook to escheat Plaintiff's particular certificates of deposit or any similarly situated certificates of deposit. In this determination, the Court is also mindful of the fact that the Bank did not surrender the contents of Plaintiff's safe deposit box to the state of Texas, though it would have been legally required to deem the box abandoned and escheat its contents during the eight-year period when the Bank lost contact with Plaintiff.

8.) Jose Leyva repeatedly testified that Plaintiff redeemed the certificates of deposit in the 1980s but was unable to provide any basis for this assertion—and later acknowledged that he did not know if the certificates of deposit were, in fact, redeemed in the 1980s. Leyva also testified that the lost-certificate-of-deposit affidavits were removed from a filing cabinet and placed in a box after ten years, yet the employee Leyva identified as holding primary responsibility for the lost-certificate affidavits, Ninfa Rodriguez, testified that the lost-certificate affidavits were never removed from the filing cabinet during her twenty-eight-year tenure at the bank. With this inconsistent testimony in mind, the Court does not find Leyva's testimony that Plaintiff redeemed the certificates of deposit in the 1980s credible.

9.) Ninfa Rodriguez and Ramona Madrid's testimony establishes that Plaintiff used the lost-certificate-of-deposit-affidavit process on at least one occasion. The Court weighs this evidence along with the totality of the evidence in this case, including Plaintiff's

---

[15] The Court finds that witness testimony indicates that the Bank likely lapsed in its adherence to its record-retention policies in the past, in particular with respect to document destruction related to the merger of First Presidio Bank and Marfa National Bank in 2008. The Court was mindful of this fact in its consideration of the Bank's overall credibility.

representation that he held at least twenty certificates of deposit with the Bank at various times. The Court is ultimately unwilling to infer that Plaintiff redeemed the particular certificates of deposit at issue in this litigation based solely on the testimony that Plaintiff did, at times, avail himself of the lost-certificate-affidavit process.

10.) The existence of the lost-certificate-affidavit process diminishes the evidentiary weight that the Court accords to the original certificates of deposit. Yet the fact that the Bank requires a sworn and notarized affidavit to redeem a certificate of deposit without the original certificate illustrates the importance of an original certificate of deposit as an authentic reflection of the Bank's debt obligation to its depositor. Likewise, the lost-certificate affidavit process illustrates the importance that the Bank places on definitively memorializing redemption transactions when the customer is unable to produce the original certificate of deposit. Accordingly, the Bank's failure to produce any lost-certificate affidavit showing that Plaintiff has redeemed the certificates of deposit weighs substantially in the Court's ultimate assessment of how much evidentiary weight to accord the original certificates of deposit.[16]

11.) Plaintiff has produced the original, physical certificates of deposit and testified that he has not previously redeemed the certificates, while Defendants have not produced witnesses or documentary evidence directly showing that the certificates of deposit were redeemed.

12.) There is no other evidence that establishes that Plaintiff redeemed the certificates of deposit at issue in this case.

13.) Further, though Plaintiff's recollection of specific dates is, at times, inaccurate, the Court otherwise finds Plaintiff's recollection of events to be reliable and finds his testimony to be broadly credible.

14.) In particular, the Court finds credible Plaintiff's testimony that he did not redeem the certificates of deposit at issue in this case.

15.) As a result, the Court concludes that the evidence shows that it is more likely than not that Plaintiff did not redeem the certificates of deposit prior to 2014.

16.) Accordingly, Plaintiff has met his burden of showing by a preponderance of the evidence that the Bank holds money which belongs to him and that the Bank has thereby been unjustly enriched.

---

[16] The Court also finds that it is, at minimum, somewhat unlikely that Plaintiff would swear out a lost-certificate affidavit to redeem his certificates of deposit while the original certificates of deposit were mere feet away in his safe deposit box.

17.) Plaintiff shall recover from Defendants $210,572.50 in damages.[17]

18.) Plaintiff shall recover interest and costs.

## III. CONCLUSION

Based upon the findings of fact and conclusions of law adopted herein, the Court finds that Plaintiff is entitled to judgment in his favor. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter its final judgment separately.

SIGNED this 2nd day of August, 2017.

_____
KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

---

[17] As explained above, the $210,572.50 damages figure is from Plaintiff's expert, Mr. John Dunbar, and Defendant expressly declined to object to the damages calculation at trial.